## State Home Loan Corporation v. Citizens Nat. Bank Of Somerset et al.

May 11, 1948.

Rehearing denied June 25, 1948.

Gene Sims for appellant.

B. J. Bethurum, Ben D. Smith and Gladstone Wesley for appellee.

OPINION OF THE COURT BY JUDGE KNIGHT—Affirming.

This case, beginning over five years ago, originally involved proceedings in the lower court to straighten out the tangled affairs of E. J. Richards, a contractor and builder operating in and around Somerset, Ky. An extensive record of six large volumes was built up in the lower court and all phases of the case have been thrashed out and settled except the one involved in this appeal. That question is the priority of liens as between appellant and appellee on lots 3, 4, and 5 in Block A and lots 35 and 37 in Block H in Gibson's Addition to Somerset or the proceeds of the sale of such lots now held by the Master Commissioner of the Pulaski Circuit Court. The lots herein involved were sold during the progress of the case through the lower court and brought less than the total liens and expenses charged up against them. The amount involved in this appeal is $3500 and interest. From the judgment of the lower court denying appellant a lien and adjudging appellee a lien on said lots and the proceeds of the sale thereof, appellant prosecutes this appeal.

### Appellant's Story.

Appellant, with principal place of business in Louisville, was engaged in making loans on homes in various parts of Kentucky, these loans being made principally on the F. H. A. plan, a government supervised and insured operation. Through its Executive Vice-President, C. Y. Sanderson, now President, appellant had had dealings with Richards, the builder, since 1940 in connection with these loans. It had made no loans direct to Richards but had obtained F. H. A. commitments for him and as he would complete the homes he was erecting under F. H. A. specifications and obtain a purchaser, appellant would make direct to the purchaser a maximum F. H. A. loan. In his building operations the appellee, Citizens National Bank, hereinafter referred to as appellee bank, took care of Richards' temporary, or what is generally known in the mortgage loan trade, "construction" financing. For several years all went well with Richards and both appellant and appellee seemed to have had satisfactory business relations with him. Everything might have worked out if Richards

could have stayed on the job to carry on his operations. But in the midst of an extensive operation he, himself, became subject to the draft. His induction into the army was imminent and, knowing that he was subject to the draft anyway, he had applied for a commission in the army. His later receipt of his commission and induction into the army and the necessity of leaving his uncompleted building operations to others is probably the cause of all of his troubles and of this lawsuit.

However, before he was inducted into the army his troubles began because his line of temporary or construction credit was becoming somewhat over-stretched at the appellee bank. Bank examiners were criticizing the appellee bank for over-extension of credit to Richards, claiming that the bank had exceeded the credit that it was allowed to make to any one borrower under the banking laws. This necessitated his looking elsewhere for construction money to meet immediate payrolls, material costs and other items of cost neces-sary to finish the houses which he had under construc-tion on the five lots involved in this litigation. Since appellee bank could lend him no more money it advised him to go to its correspondent bank, the First National Bank of Louisville. That bank did tentatively agree to make him a loan but his money must await the usual processing, such as credit reports, title examination, passing on the loan by the bank's loan committee which would, of course, take some time. But he needed the money right now to meet payrolls. In his urgent need he went to the loan office of appellant while in Louis-ville and discussed the matter with Mr. C. Y. Sander-son, then Executive Vice-President, now President of the appellant corporation. As the result of that visit Sanderson agreed to and at that time did loan Richards $2000. Later, on urgent telephone calls from Richards, he added another $500 and still later another $500 to this sum making a total of $3000 which Sanderson, acting for appellant, let Richards have to complete the houses on the lots involved herein, the last sum having been advanced to Richards on June 27, 1942. Later on, when Richards was about to enter the army and turned these houses over to Sanderson to be finished and sold, San-derson expended on the houses an additional $500 for landscaping and finishing the houses, making a total of

$3500 which is the total of appellant's claim herein, plus certain interest, and for which it has been given a judgment against Richards in the lower court. There is no dispute about this judgment, the only dispute being its priority as a lien on the property in question or the funds resulting from the sale of that property.

When this temporary loan was made by appellant to Richards it was made with the understanding and agreement that as the loans were closed with the First National Bank, the temporary loan by appellant would be paid off with the proceeds of the First National loan. Loans by the First National to Richards on two of the completed houses on lots 3 and 4, Block A, were closed on or about July 1, 1942, and the proceeds disbursed to Richards. He did not turn over part of this money to appellant to pay off the temporary loans in accordance with the understanding between them and Mr. Sanderson, President of appellant, went to Somerset to collect his money from Richards or take the necessary steps to secure same. Richards was unable to pay appellant any of the money due it, and to secure appellant, and as a practical method of working out the situation, Richards, joined by his wife, executed an outright deed to C. Y. Sanderson covering the five lots involved herein. It was agreed between Sanderson and Richards that Sanderson was to sell the houses that were completed, finish such as were not completed, pay off the amount due appellant and pay off the $4,000 mortgage of the First National covering two of the lots. If anything was left, it was to be placed in the bank to Richards' credit. This deed from Richards to Sanderson was dated July 21, 1942, was mailed to Sanderson on August 1, 1942, and was recorded on August 22, 1942. Sanderson proceeded to carry out this arrangement and was about to close the first sale thereunder when the whole plan was blocked by the fact that in the meantime the appellee bank had secured from Richards a blanket mortgage to secure about $30,-000 which Richards owed the bank. This mortgage covered not only the five lots herein involved but other property owned by Richards. This mortgage was dated August 24, 1942, and was recorded August 26, 1942, four days after the deed to Sanderson. The appellee refused to release its mortgage on any of the lots as

they were sold, thus blocking the carrying out of the arrangement by which Sanderson was to sell the houses and pay off the debts of Richards. The material suppliers in order to secure themselves then filed mechanics liens against the property, later filed this suit to enforce these liens and thereby precipitated this litigation and its resulting consequences.

### Appellee's Story.

From its pleadings and proof appellee, Citizens National Bank, relies on the following to substantiate its claim to priority; E. J. Richards had purchased the five lots involved herein at a judicial sale on or about September 6, 1941. He did not have the necessary funds to pay off his bids and take deeds to the lots from the Commissioner of the Court. He therefore arranged for loans on each lot of $3600 to $3750, totaling in all $18,300, with appellee bank and to secure same executed an assignment of his bid on each lot to appellee bank, which assignments were accepted by the Master Commissioner. These assignments were dated November 10, 1941, and under them the deeds were to be made direct to appellee bank. Later, on June 4, 1942, Richards agreed with appellee bank that if it would let the deeds to said lots be made direct to Richards, instead of to appellee bank as had been agreed by the assignment, he would then execute to the bank mortgages to each of the lots covering its loans. This was agreed to and at the request of the bank the Master Commissioner executed deeds direct to Richards, appellee bank having waived its rights under the assignment of bids heretofore referred to, expecting the mortgages to be executed by Richards to the bank in lieu thereof. Richards failed to execute these mortgages but instead deeded these lots to Sanderson by the deed of July 21, 1942. Sanderson knew that Richards was indebted to the appellee bank and agreed with Richards, who was about to enter the army, that he, Sanderson, would execute these mortgages to appellee bank, which he failed and refused to do. When it became apparent that Sanderson would not execute the mortgages to appellee bank, it prepared a power of attorney from Richards to its attorney, Judge B. J. Bethurum, sent it to Richards at his army post for execution. Upon its return, Judge Bethurum for and on behalf of Richards and acting under this

power of attorney, executed a mortgage to appellee bank covering the five lots herein involved. This mortgage was dated August 24, 1942, and was recorded August 26, 1942.

The deed of Richards to Sanderson, dated July 21, 1942, was not delivered with the intention that it pass title but was merely made to Sanderson so that he could execute mortgages to appellee bank and so that he could pass title to purchasers of the lots as they were sold because Richards was in the army and would not always be accessible. This is shown by the letter dated August 1, 1942, which transmitted said deed from Richards to Sanderson under which he gave specific directions as to each lot, including directions to Sanderson to execute notes and mortgages on certain lots to appellee bank. The whole trouble was caused by the failure of Sanderson to carry out this agreement to execute these mortgages to appellee bank.

## Priorities.

It will thus be seen that the contentions of the parties, each supported by some proof, are in conflict and the answer will have to be determined on questions of fact rather than on any legal priorities under the recording statutes.

It will also be seen from the above recitations that both appellant and appellee were negligent in securing and protecting themselves in their respectively claimed liens, but for which negligence on their part this decision on the priority of their claims would not have been necessary.

Appellant's negligence, as we see it, consisted in its failure to secure its original loan by a proper mortgage. In spite of the temporary nature of the loan, appellant should have secured itself with a temporary mortgage covering the amount of money it was letting Richards have pending the receipt of his money from the First National Bank. Appellant would then have been secure against any loss and as the more permanent First National loans were closed, appellant's mortgage could have been released either in part, if the First National mortgage covered one lot, or all if it covered all. This is the accepted practice by all financial companies

making temporary construction loans. But appellant did not do this, apparently accepting Richards' word that as he got the money from the First National Bank, he would repay appellant the money furnished him on a temporary basis.

The negligence of the appellee bank, as we see it, was its failure to obtain the mortgages from Richards before it released the assignment liens which Richards had executed to it prior to his receipt of the Commissioner's deeds. Instead of relying on the promise of Richards that he would execute the mortgages to the appellee bank upon its release of these assignments, it should have required from Richards the execution of the mortgages and then released its assignment liens upon the recording of the mortgages taken in lieu thereof. That would have been the regular, accepted practice of financial institutions making real estate loans.

In its brief appellant relies largely on the element of time and the statutory recording laws to sustain its priority claim. It contends that when the appellee bank released its assignment of bid lien of November 10, 1941, and allowed the Commissioner to execute deed to Richards on June 4, 1942, free of lien, appellee bank's lien was gone, certainly as between the bank and third parties, whatsoever equitable lien the bank might have still had against Richards; that after the release of this assignment of bid lien, appellant put to record its deed from Richards which it now asserts is in reality and to all intents and purposes a mortgage; that this deed, or mortgage, recorded August 22, 1942, then became the first lien on the lots in question, subject only to the mortgage on two of the lots to the First National Bank of Louisville, which was recorded on July 1, 1942; that the mortgage which Richards, himself, executed to appellee bank under the power of attorney executed to Judge Bethurum and which was recorded on August 26, 1942, is also inferior to appellant's deed or mortgage recorded August 22, 1942. On this basis of time of recording under the statutory recording laws appellant's contention is undoubtedly sound and if the deed from Richards to Sanderson, the rights in which were assigned to appellant, had been an outright mortgage to secure the debt Richards owed appellant and that mortgage had been recorded as was the deed, after the re-

lease of appellee bank's assignment lien and before appellee bank's mortgage from Richards, then there could be no serious question of the priority of appellant's lien.

The whole question seems to us to turn on this deed, on the purpose for which it was executed and the knowledge which Sanderson had of the indebtedness of Richards to appellee bank for the purchase price of the lots and for the erection of houses on those lots. It therefore becomes a question of fact and on the controlling and important facts, there is a hopeless conflict in the testimony. Upon this testimony the Chancellor in a written opinion found that Sanderson, who had been dealing with Richards on his F. H. A. loans since 1940, was familiar with the entire set-up and knew of the agreement between Richards and appellee bank to execute mortgages to the bank, upon release of its assignment liens, to secure money advanced to Richards for the erection of the houses. From the proof the Chancellor held that the deed which Richards executed to Sanderson was only a deed for convenience with a number of conditions attached; that it was not a mortgage and afforded no security for the indebtedness due appellant by Richards and that the deed should be cancelled and held for naught. The Chancellor was of the opinion that the mortgage executed by Richards to appellee bank and recorded on August 26, 1942, was a valid mortgage.

After careful consideration of all the testimony on the issues involved we cannot say that the Chancellor erred in his conclusions. In accordance with our rule that where the testimony is conflicting and we are left in doubt, the decision of the Chancellor will not be disturbed. Accordingly the judgment of the lower court is affirmed.

Judgment is affirmed.